UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-24548-Civ-COOKE/TORRES

CIELO JEAN GIBSON, CORA SKINNER,
VIVIAN KINDLE, ALICIA WHITTEN,
ASHLEY VICKERS, DESSIE MITCHESON,
DEVIN JUSTINE TAKEGUMA, et al.,

    Plaintiffs,

vs.

BTS NORTH, INC., doing business as
Booby Trap, T.K. PROMOTIONS, INC.,
doing business as Booby Trap, et al.,

    Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before me on Plaintiffs' Motion for Summary Judgment ("Motion") (ECF No. 38), which includes Plaintiffs' Statement of Undisputed Facts as required by Local Rule 56.1. Defendants filed a Response in Opposition (ECF No. 41), as well as a separate Response to Plaintiffs' Statement of Undisputed Facts and Additional Facts in Opposition (ECF No. 42). Plaintiffs filed a timely Reply (ECF No. 43). Having carefully considered the parties' briefs, the record, and the relevant legal authorities, Plaintiffs' Motion for Summary Judgment is granted in part and denied in part.

### I.    BACKGROUND

Plaintiffs are Cielo Jean Gibson, Cora Skinner, Vivian Kindle, Alicia Whitten, Ashley Vickers, Dessie Mitcheson, Devin Justine Takeguma, Eva Pepaj, Jessica Burciaga, Lina Posada, Marketa Kazdova, Paola Canas, and Tina Quarles. Each Plaintiff is a professional model, actress, and/or businesswoman who earns her living by promoting her image, likeness, and/or identity to select clients, commercial brands, media, and entertainment

1

outlets. Motion, ¶ 1.[1] Each Plaintiff relies on her professional reputation and brand for modeling, acting, and other professional opportunities and has worked to establish herself as reliable, reputable, and professional. *Id.* at ¶¶ 2–3. Each Plaintiff aims to control the use and dissemination of her image and participates in the negotiation, vetting, and selection of her professional engagements. *Id.* at ¶ 4. Each Plaintiff has submitted a declaration stating she has been vigilant in building and protecting her brand from harm, taint, or other diminution. *Id.* When marketing and promoting their images, Plaintiffs negotiate and expressly grant authority for the use of their image pursuant to agreed-upon terms, conditions and compensation. *Id.* at 5.

Defendants are corporate entities BTS North, Inc., T.K. Promotions, Inc., P.T.G. Entertainment, Inc., and Booby Trap, Inc., each of which owns or co-owns and operates one of three "full friction and full nudity" gentlemen's clubs ("Clubs"). *Id.* at ¶¶ 12–14. Each Club maintains a Facebook page, which advertises its business, events, and parties. *Id.* Each Plaintiff had one or more of her images used on at least one of the Club's Facebook pages without her consent. *Id.* at ¶¶ 6–9. Defendants did not compensate any Plaintiff for the use of any of their images. *See generally* Plaintiffs' Decl., 1–13. Each Plaintiff has affirmed that she was never employed by, contracted with, or has otherwise given permission or consent to Defendants to use her image in any way to advertise, promote, market, or endorse "Defendants' full friction and full nudity lifestyle activities and business." Motion, ¶ 6. Even if asked in advance by Defendants, each Plaintiff has declared she would not, under any circumstances and regardless of the compensation offered, have permitted or consented to the use of her image by Defendants to advertise, promote, market, or endorse Defendants' lifestyle activities and business. *Id.* at ¶ 8.

Plaintiffs claim that Defendants knew they used Plaintiffs' images without authorization. For support, they point to the deposition testimony of Defendants' corporate representative, Philip Gori, and Defendants' office manager and bookkeeper, Patricia Pettinato. When asked during his deposition if any of the Defendants ever contacted any of the Plaintiffs to get their consent, if they ever negotiated with the Plaintiffs to compensate

---

[1] The parties' statements of material facts set forth in their Motion filings are deemed admitted to the extent they are supported by evidence in the record and not specifically disputed in an opposing statement of facts. S.D. Fla. L.R. 56.1(b); *see also Gossard v. JP Morgan Chase & Co.,* 612 F. Supp. 2d 1242, 1245–46 (S.D. Fla. 2009).

them, or if anyone obtained Plaintiffs' consent on behalf of Defendants, Mr. Gori testified, "Never happened." Gori Depo, 122:13–124:5. However, Mr. Gori also testified that he assumed J Dog Media, Inc. ("J Dog Media"), a separate company, created the graphic designs. *Id.* at 122:13–21. Mr. Gori also testified in his deposition that J Dog Media does the advertisements for the Clubs, and to him, advertisements means radio and print. Gori Depo, 50:18–51:4. Plaintiffs then point to two hundred ninety-eight J Dog Media invoices that do not contain a specific charge for social media advertising, posting, or promotion. Motion, ¶ 25. Ms. Pettinato testified that no one at the Clubs has any correspondence from Plaintiffs. Pettinato Depo., 12:11–23. She also testified that the Club managers decide on promotions such as drink specials and parties; however, contrary to Plaintiffs' assertions in their Motion, Ms. Pettinato did not testify that the managers are generally responsible for creating social media advertising. *Id.* 53:21–57:20.

Defendants contend they had no knowledge regarding the creation of the advertisements, including that the use of Plaintiffs' images in the advertisements was unauthorized. Defendants point to a declaration of Mr. Gori, which states J Dog Media, a third party contractor, created the advertisements. Gori Decl., ¶ 2, 7. In addition, the owner of J Dog Media, Darren Franclemont, submitted a declaration that J Dog Media is a separate company that provides advertising of all kinds for mainstream commercial businesses and "Gentlemen's Clubs," including the Defendants in this case. Franclemont Decl., ¶¶ 1, 3. Mr. Franclemont stated that J Dog Media prepared the Facebook pages at issue and said no one associated with Defendants directed him to use specific individuals for any of the advertisements. *Id.* at ¶¶ 3, 4. Further, he claims that "in procuring the images at issue, these images were not altered in any way, and were located on other Facebook sites and pages, none of which were Facebook pages associated with, or describing by name, any Plaintiff, and all of which invited 'sharing' on the internet." *Id.* at ¶ 8. Mr. Franclemont chose the images "solely because the images depicted attractive females, and not on the basis of any person's identity, celebrity, popularity, or any personal basis or characteristic associated with any particular Plaintiff." *Id.* at ¶ 9.

Plaintiffs maintain that the use of their images confused consumers into thinking that they were affiliated with Defendants and their Clubs' activities. To support their claim of consumer confusion, Plaintiffs submitted an expert report from Dr. Martin Buncher, which

includes a consumer survey. Buncher Rep., ECF No. 38-16. The consumer survey used three representative images from Defendants' advertisements. *Id.* at 8, 68–78. Only two of the images used were attached to the Complaint and are at issue in this case. ECF Nos. 1-2, 1-9. It is not readily apparent if the woman in the third image is one of the named Plaintiffs in this case, or which one she may be. The population surveyed included only "adult (21 and over) male Florida residents who had patronized a Bikini Bar/Gentleman's Club/Strip Club in the past two years." Buncher Rep. at 9. The survey itself included advertisements from two other clubs, although the collected data was disaggregated. *Id.* at 12–15, 49–86. According to the survey data, 94% of respondents thought the models in the advertisements had agreed to be in the advertisements. *Id.* at 12. 91% of respondents thought the models agreed to promote the Club in the advertising. *Id.* Nine out of ten respondents thought the models represent the lifestyle to which the Club is oriented, and almost four out of five thought the models enjoyed a lifestyle like that reflected in the advertising and might participate in some of the events described in the advertising. *Id.* at 13. Additionally, 75% of respondents thought it was "extremely likely" the models were used "to make them think they represented the kind of women they would expect to see at the club," while another 20% thought it was "somewhat likely." *Id.* Plaintiffs also submitted the Expert Report of Stephen Chamberlin to support their claim for damages. Chamberlin Report, ECF No. 38-15.

## II.  LEGAL STANDARD

Summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is "genuine" if the record is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material" facts are those that might affect the outcome of the case under the governing substantive law. *Id.* Courts must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

Plaintiffs move for summary judgment on all seven counts in their Complaint, as well as on damages. Counts I and II allege Lanham Act violations. Counts III and IV allege

statutory and common law misappropriation of likeness claims. Count V and VI are claims for civil theft and conversion. Count VII is a claim for unjust enrichment.

### A. Lanham Act Claims

Plaintiffs bring their Lanham Act claims under Section 1125(a), which provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>  **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>  **(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). "Section 1125(a) thus creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 134 S. Ct. 1377, 1384 (2014)

### i. False Advertising

To succeed on their Lanham Act false advertising claim, Plaintiffs must ultimately prove "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395 (2014). The Eleventh Circuit has outlined five elements which a Plaintiff must show to prove a false advertising claim: "(1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) [Plaintiffs have] been—or [are] likely to be—injured as a result of the false advertising." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).

To show the advertisements at issue here were false or misleading, Plaintiffs can show they were either "literally false as a factual matter" or, if literally true or ambiguous, the advertisements "implicitly convey a false impression, are misleading in context, or [are]

5

likely to deceive consumers." *Id.* (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998)). "When determining whether an advertisement is literally false or misleading, courts 'must analyze the message conveyed in full context,' and 'must view the face of the statement in its entirety.'" *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010) (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 2147 (11th Cir. 2002)). "Statements that have an unambiguous meaning, either facially or considered in context, may be classified as literally false." *Id.* (citing *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1180 (8th Cir.1998)). "As the meaning of a statement becomes less clear, however, and it becomes susceptible to multiple meanings, the statement is more likely to be merely misleading." *Id.* (citing *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)).

Plaintiffs contend the advertisements at issue are literally false. In Plaintiffs' Complaint, they allege the images were "altered to intentionally give the impression that [each Plaintiff was] either a stripper working at the strip clubs or that she endorses the strip clubs." Compl., ¶¶ 57, 69, 81, 93, 105, 117, 129, 141, 154, 165, 177, 189, 201. However, in the instant Motion, they simply say that the advertisements "necessarily conveyed or implied each Plaintiff's association with[,] endorsement of, and support for the Clubs." Motion, ¶ 28. Given that Plaintiffs have not shown that the images themselves were altered, it is clear that the images in the advertisements are actual images of Plaintiffs. They therefore are not literally false, even if used on Defendants' Facebook pages. *See Unique Sports Products, Inc. v. Wilson Sporting Goods Co.*, 512 F.Supp.1318 (N.D. Ga. 2007) ("Sampras's picture alone is not 'literally false.'"). Two other courts presented with virtually identical lawsuits (and some of the same Plaintiffs) have similarly found that an unauthorized use of a photograph is not a literally false statement, even if the image was altered. *Edmonson, et al. v. Velvet Lifestyles, LLC., et al.*, Case No. 15-CV-24442, ECF No. 174, 14 (S.D. Fla. July 28, 2017) ("[T]he Court has found no authority (and Plaintiffs have cited none) holding that the unauthorized use of a photograph to advertise a product or business constitutes a 'literally false' advertisement."); *Gibson, et al. v. Resort at Paradise Lakes, LLC, et al.*, Case No. 8:16-CV-791-T-36AAS, ECF No. 142, 27 (M.D. Fla. Feb. 2, 2018) ("The images are not literally false just because the Defendants slightly altered the Plaintiffs'

photographs to include them in the advertisements."). Without more, such use is not literally false.

However, while the advertisements are not literally false, they may still be misleading. *Osmose, Inc.*, 612 F.3d at 1308. To prove this second type of falsehood, Plaintiffs "must 'present evidence of deception' in the form of consumer surveys, market research, expert testimony, or other evidence." *Hickson*, 357 F.3d at 1261 (citing *1-800 Contacts, Inc.*, 299 F.3d at 1247). "Consumer survey research often is a key part of a Lanham Act claim alleging that an advertisement is misleading or deceptive." *Id.*

Plaintiffs have submitted an expert report from Dr. Martin Buncher, which includes a consumer survey. Buncher Rep., ECF No. 38-16. The consumer survey used three representative images from Defendants' advertisements, only two of which are at issue in this case. *Id.* at 8, 68–78; ECF Nos. 1-2, 1-9. The survey itself also included advertisements from two other non-party clubs, which used fairly different advertisements. Buncher Rep., 12–15, 49–86. According to the survey data, 94% of respondents thought the models in the advertisements had agreed to be in the advertisements. *Id.* at 12. 91% of respondents thought the models agreed to promote the Club in the advertising. *Id.* Nine out of ten respondents thought the models represent the lifestyle to which the Club is oriented, and almost four out of five thought the models enjoyed a lifestyle like that reflected in the advertising and might participate in some of the events described in the advertising. *Id.* at 13. Additionally, 75% of respondents thought it was "extremely likely" the models were used "to make them think they represented the kind of women they would expect to see at the club," while another 20% thought it was "somewhat likely." *Id.* It is undisputed that "[n]o Plaintiff has ever been employed by, contracted with or otherwise given permission or consent to defendants in any way for the use of her image by Defendants" to promote their businesses. Motion, ¶ 6. Even had Plaintiffs been asked by Defendants, "no Plaintiff would, under any circumstances and regardless of the compensation offered, have permitted or consented to the use of her image by Defendants" to promote their businesses. *Id.* at ¶ 8.

While Defendants did not depose Mr. Buncher or provide counter evidence in the form of other surveys, Defendants contest the validity of the survey based on the fact that the survey had a small sample size, included images of other women used by other clubs, and used only two of the 57 advertisements at issue in this case representing only two (or

possibly three) of the thirteen Plaintiffs. I find Defendants' issues with the survey to be valid, and "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) (citing *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of California*, 694 F.2d 1150, 1156 (9th Cir. 1982)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). Taking the survey in the light most favorable to Defendants, a reasonable juror could find it unpersuasive, especially as applied to the 55 other advertisements at issue in this case.

The only other element Plaintiffs address in their Motion of the five required elements constituting a false advertisement claim is whether "the misrepresented product or service affects interstate commerce." *Hickson*, 357 F.3d at 1260. Plaintiffs contend Defendants used the internet to market their services, and Defendants do not contest this. The internet constitutes an instrumentality of interstate commerce. *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004). Plaintiffs have met the interstate commerce requirement.

However, Plaintiffs do not discuss or attempt to explain how the deception had a material effect on consumers' purchasing decisions. *Hickson Corp.*, 357 F.3d at 1260. Materiality can be shown "by proving that 'the defendants misrepresented an inherent quality or characteristic of the product.' The materiality requirement is based on the premise that not all deceptions affect consumer decisions." *1-800 Contacts, Inc.*, 299 F.3d at 1250 (quoting *Nat'l Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 855 (2d Cir.1997) (internal quotations omitted)). While the survey found "[j]ust over 90%" of the participants were more likely to be interested in patronizing Defendants by seeing the ads with Plaintiffs than they were from seeing the same advertisements without Plaintiffs, Buncher Rep. at 13, viewed in the light most favorable to Defendants, this does not mean consumers would *actually* be more likely to frequent Defendants' establishments based on seeing Plaintiffs in the advertisements.

Plaintiffs have also not addressed the last element of a false advertising claim: how they have been, or are likely to be, injured as a result of the false advertising. *Hickson Corp.*, 357 F.3d at 1260. In their Statement of Material Facts, Plaintiffs claim they are entitled to

8

compensation for the fair market value of the use of their image. Resp., ¶ 20. This injury, however, has nothing to do with whether Defendants use of Plaintiffs' images was false or misleading and was not necessarily proximately caused by the advertisements being false or misleading. I therefore find that Plaintiffs have not met all the elements of a Lanham Act false advertising claim and are not entitled to judgment as a matter of law.

### ii. False Endorsement

In the Eleventh Circuit, a false endorsement claim under the Lanham Act is treated the same as a trademark infringement or false association claim. *See Univ. of Ala. Bd. Of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012) ("[W]e have never treated false endorsement and trademark infringement claims as distinct under the Lanham Act."). To prove a false endorsement claim, Plaintiffs "must show (1) [they] had trademark rights in the mark or name at issue and (2) that [Defendants] had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012) (quoting *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010)). Plaintiffs do not need to have a registered trademark to receive protection under the Lanham Act. *Tana*, 611 F.3d at 773. The Eleventh Circuit has "recognized that 'the use of another's unregistered, *i.e.,* common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source.'" *Id.* (quoting *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512–13 (11th Cir.1984) (internal quotations and citations omitted)). However, a trademark must be sufficiently distinctive—capable of distinguishing the owner's goods from another's—to be eligible for protection. *Id.*

> The Eleventh Circuit has recognized four categories of distinctiveness:
>
> (1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks.

9

*Id.* (quoting *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797–98 (11th Cir. 2003)). Suggestive and arbitrary or fanciful marks are deemed "inherently" distinctive and are generally entitled to trademark protection. *Id.* Descriptive marks may become sufficiently distinctive to receive protection if they acquire secondary meanings. *Id.* Generic marks generally do not receive trademark protection. *Id.*

In the Eleventh Circuit, courts apply a seven factor test to evaluate whether there is a likelihood of confusion between two marks:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Tana*, 611 F.3d at 774–75. Plaintiffs urge the use of the Ninth Circuit's eight factor test outlined in *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007–08 (9th Cir. 2001), which restated its traditional false endorsement test in the celebrity-likeness context. Courts in the Eleventh Circuit faced with similar fact patterns have generally applied the factors set forth in *Tana*. *See Gibson, et al. v. Resort at Paradise Lakes, LLC, et al.*, Case No. 8:16-CV-791-T-36AAS, ECF No. 142, 27 (M.D. Fla. Feb. 2, 2018). I find the tests to be fairly similar, but will apply the factors as outlined by the Eleventh Circuit in *Tana*.

Applying these factors to the facts in the instant case, and viewing those facts in the light most favorable to Defendants, I find Plaintiffs have not shown they are entitled to judgment as a matter of law on their false endorsement claim.

### 1. Strength of Mark

Plaintiffs argue their images, which encompass their actual identities, are by definition inherently distinctive, or have at least acquired distinctiveness through secondary meaning by virtue of the Plaintiffs building a brand around themselves. Defendants do not distinguish their argument between false advertising and false endorsement, and simply contend that Plaintiffs' claims fail because they are not recognizable celebrities.

Plaintiffs argue they do not need to be "celebrities" to receive protection of their likeness under the Lanham Act. They cite to *Arnold v. Treadwell* in support. *Arnold v. Treadwell*, 642 F. Supp. 2d 723, 724 (E.D. Mich. 2009). In *Arnold*, the court was faced with

an aspiring model whose image was used without her consent in a magazine "portraying criminal practices as a lifestyle, sexually demeaning images of women, and violence against the general public as a form of media and entertainment." *Arnold*, 642 F. Supp. 2d at 724. Because the plaintiff had alleged an intent to commercialize her identity, the court found she had the requisite commercial intent for purposes of stating a Lanham Act claim. *Id.* at 735. The court did not, however, address the strength of the plaintiff's identity as a mark. *See id.*

I understand Defendants' real argument to be that Plaintiffs do not have a strong mark. A court considers four factors in determining whether there is a secondary meaning to a plaintiff's mark: "(1) 'the length and nature of the [mark's] use,' (2) 'the nature and extent of advertising and promotion of the [mark],' (3) 'the efforts of the proprietor to promote a conscious connection between the [mark] and the business,' and (4) 'the degree of actual recognition by the public that the [mark] designates the proprietor's product or service.'" *Tana v. Dantanna's*, 611 F.3d 767, 776 (11th Cir. 2010) (quoting *Welding Servs.,* 509 F.3d at 1358.). These factors do not lend themselves as easily to Plaintiffs whose mark is their identity rather than their name; however, Plaintiffs have stated they have used their image to establish a "brand for modeling, acting, hosting and other professional opportunities" and "seek to control the use and dissemination of [their] image . . . and [are] vigilant in building and protecting [their] brand from harm, taint or other diminution." Motion, ¶¶ 2, 4. While Plaintiffs never explicitly state what exactly their brands represent, Plaintiffs' declarations satisfy the first three factors. Plaintiffs have not, however, submitted any information as to whether their likenesses are recognized by the public. Taken in the light most favorable to Defendants, I find this factor to be neutral.

### 2. Similarity of Infringed Mark

Because Defendants used the Plaintiffs' actual images in their advertising, the similarity is about as strong as can be. This factor therefore weighs in Plaintiffs' favor.

### 3. Similarity of Product and Services and Similarity of Sales Outlets and Customer Base

Plaintiffs are models and actresses who offer modeling and acting services; to the extent the third factor weighs in any party's favor, Plaintiffs' entire lawsuit is premised on the fact that they would never, "under any circumstances and regardless of compensation offered, have permitted or consented to the use of her image by Defendants to advertise,

promote, market or endorse Defendants' full friction and full nudity lifestyle activities and business, even if asked in advance." Motion, ¶ 8. Plaintiffs and Defendants seem to offer very different products and services. The third factor therefore seems to weigh in favor of Defendants.

However, Plaintiffs do claim they vie for the same dollars as Defendants because "Defendants' customers also fall within a subset of the demographic that is interested in beautiful women." Motion, ¶ 44. In addition, Plaintiffs have shown both they and Defendants use websites and social media such as Twitter and Facebook to reach their target audience. Defendants do not discuss whether they share customers with Plaintiffs, or whether they share sales outlets and offer similar products. The fourth factor therefore weighs in Plaintiffs' favor.

### 4. Intent to Capitalize on Plaintiffs' Goodwill

Whether Defendants' specifically intended to capitalize on Plaintiffs' goodwill is difficult to determine. "When analyzing an alleged infringer's intent, we must determine whether the defendant 'adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation.'" *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 940 (11th Cir. 2010) (quoting *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1339 (11th Cir. 1999)). Plaintiffs claim Defendants intended to profit by creating confusion among consumers that Plaintiffs had endorsed their products and services. However, Plaintiffs cite to Mr. Buncher's report for support, and Mr. Buncher's report merely states that consumers were likely confused; it makes no contention whatsoever about Defendants' intent. *See generally* Buncher Rep. Defendants have at a minimum created an issue of fact as to whether they even created the ads, which would belie any intent on their part. *See* Franclemont Dec., ¶ 3 (stating J Dog Media, a third party contractor, created every exhibit attached to the Complaint). Further, Mr. Franclemont stated he selected Plaintiffs' images because Plaintiffs were pretty, not on the basis of "any person's identity, celebrity, popularity, or any personal basis or characteristic." *Id.* at ¶ 9. The depositions of Mr. Gori and Ms. Pettinato certainly do not contradict this. *See* Gori Depo., 50:18–51:4; 122:12–21; Pettinato Depo., 12:11–23; 53:21–57:20. This fifth factor favors Defendants.

### 5. Existence and Extent of Actual Consumer Confusion

The extent of actual consumer confusion is shown through Plaintiffs' consumer survey, as discussed above. "The last factor, actual confusion in the consuming public, is the most persuasive evidence in assessing likelihood of confusion." *Tana v. Dantanna's*, 611 F.3d 767, 779 (11th Cir. 2010). Plaintiffs' consumer survey showed that 94% of respondents thought the models in the advertisements had agreed to be in the advertisements and 91% thought the models agreed to promote the Club in the advertising. *Id.* Nine out of ten respondents thought the models represent the lifestyle to which the Club is oriented, and almost four out of five thought the models enjoyed a lifestyle like that reflected in the advertising and might participate in some of the events described in the advertising. *Id.* at 13. However, the same issues that plague the survey in the false endorsement context (sample size, use of images, etc.) continue to plague it in the false advertising context. *See supra*, III. A. i. False Advertising. In addition, Defendants point out that the survey did not ask if respondents recognized Plaintiffs. Again, taking the survey in the light most favorable to Defendants, a reasonable juror could find it deserves little weight in determining if the advertisements confused the public.

Taking all of the above factors together and in the light most favorable to Defendants, Plaintiffs have not shown they are entitled to judgment as a matter of law on their false endorsement claim.

### B. Statutory and Common Law Misappropriation of Likeness

Count III alleges a violation of Florida Statute § 540.08, which provides a cause of action for the unauthorized publication of name or likeness. Count IV alleges a violation of the common law right of privacy[2], which is the unauthorized misappropriation of name or likeness. "Under Florida law, the elements of common law invasion of privacy— commercial misappropriation of likeness coincide with the elements of unauthorized publication of name or likeness in violation of Fla. Stat. § 540.08." *Lane v. MRA Holdings, LLC*, 242 F. Supp. 2d 1205, 1220 (M.D. Fla. 2002).

As excerpted in *Lane*, Fla. Stat. § 540.08 provides in pertinent part:

> Unauthorized publication of name or likeness ... No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other

---

[2] Plaintiffs label this as a right of "publicity" in both their Complaint and the instant Motion; however, the case law they cite refers to the common law right to privacy.

> likeness of any natural person without the express written or oral consent to such use given by ... [s]uch person ...
>
> In the event the consent required ... is not obtained, the person whose name, portrait, photograph, or other likeness is so used ... may bring an action to enjoin such unauthorized publication, printing, display or other public use, and to recover damages for any loss or injury sustained by reason thereof, including an amount which would have been a reasonable royalty, and punitive or exemplary damages.

*Id.* at 1212. Plaintiffs claim Defendants have done exactly that: use their images for a commercial or advertising purpose without their consent. Defendants first argue that Plaintiffs' statements that they did not consent to Defendants' use of their images are conclusory and insufficient for summary judgment purposes. This argument is meritless. Signing a declaration that they did not provide consent is not conclusory. Plaintiffs have firsthand knowledge of whether they signed a contract with Defendants or otherwise provided an oral statement allowing Defendants to use their images. How else would Plaintiffs show the absence of a contract except through their own statement of knowledge? Because Defendants have come up with absolutely no evidence showing Plaintiffs *gave* their consent, I find Plaintiffs' statements in their declarations to be sufficient to show lack of consent.

Defendants also argue that Plaintiffs have not shown the images were used in a manner to associate Plaintiffs specifically with Defendants' businesses, as required by Florida law. Whatever this means, Defendants' cited cases[3] do not contain this statement of the law. Defendants correctly cite the law when they say Plaintiffs must show that Defendants used their images to directly promote a product or service. *Loft v. Fuller*, 408 So. 2d 619, 623 (Fla. Dist. Ct. App. 1981). This is where Plaintiffs have made conclusory statements. *See, e.g.* Motion at ¶¶ 9, 31. ("Defendants used each Plaintiff's image in advertisements for commercial purposes."). However, the images themselves support Plaintiffs' statements and Defendants do not argue that they did not use the images as part of marketing their Clubs. Defendants argue instead that because the images were already widely published on Facebook, which is where Defendants allegedly accessed the pictures, Plaintiffs have no cause of action. Defendants cite many cases for the proposition that

---

[3] *Epic Metals Corp. v. CONDEC, Inc.*, 867 F.Supp. 1009, 1016 (M.D. Fla. 1996); *Tyne v. Time Warner Entertainment, Co.*, 901 So. 2d 802 (Fla. 2005).

"[r]epublication of facts already publicized elsewhere cannot provide a basis for an invasion of privacy claim." *Heath v. Playboy Enterprises, Inc.*, 732 F.Supp. 1145, 1448 (S.D. Fla. 1990). However, as Plaintiffs note, these cases are inapposite because the invasion of privacy at issue in those cases is the public disclosure of private facts. Here, Plaintiffs make a claim of misappropriation of likeness; the harm is markedly different. In misappropriation cases, "the publication is harmful not simply because [the image] is included in a publication that is sold for a profit, but rather because of the way it associates the individual's name or [her] personality with something else." *Id.* Plaintiffs have satisfied the elements of the misappropriation of likeness claims and I grant summary judgment on Counts III and IV in Plaintiffs' favor.

### C. Civil Theft and Conversion

"To establish a claim for civil theft, a party must prove that a conversion has taken place and that the accused party acted with criminal intent." *Heldenmuth v. Groll*, 128 So. 3d 895, 896 (Fla. Dist. Ct. App. 2013) (quoting *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1056 (Fla. Ct. App. 2008)). "If there was no factual basis to support a claim for conversion, there can be no cause of action for civil theft." *Id.* I will therefore first analyze whether Plaintiffs have satisfied their burden of showing a common law conversion claim.

"[C]onversion is defined as an act of dominion wrongfully asserted over another's property inconsistent with his ownership of it." *Belford Trucking Co. v. Zagar*, 243 So. 2d 646, 648 (Fla. Dist. Ct. App. 1970). "[T]he essence of conversion is not the possession of property by the wrongdoer, but rather such possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled to possession of the property, which intent may be, but is not always, shown by demand and refusal." *Senfeld v. Bank of Nova Scotia Tr. Co. (Cayman)*, 450 So. 2d 1157, 1161 (Fla. Dist. Ct. App. 1984).[4]

---

[4] There appears to be a split among Florida District Courts of Appeals as to whether a conversion claim requires intent. *See Small Bus. Admin. v. Echevarria*, 864 F. Supp. 1254, 1262 (S.D. Fla. 1994) (recognizing "a split of authority among Florida courts" and following *Senfeld* and "the great weight of authority"); *United States v. Bailey*, 288 F. Supp. 2d 1261, 1264 (M.D. Fla. 2003), *aff'd*, 419 F.3d 1208 (11th Cir. 2005) (recognizing a split but choosing not to follow *Senfeld* in claim for conversion of money). Because all parties appear to agree that intent applies, I will follow the *Senfeld* and *Ecehvarria* decisions and the "great weight of authority."

Plaintiffs have not shown Defendants' possessed the requisite intent to deprive them of the use of the images, or as Plaintiffs put it, deprive them "of the choice to determine where their images can appear and who can use them for what purpose." Motion, ¶ 34. First, Plaintiffs have pointed to no facts in the record showing Defendants themselves had such intent. Mr. Franclemont, who works for a third party vendor, has stated he created the advertisements at issue. Franclemont Dec., ¶ 3. Mr. Gori testified he assumed J Dog Media created the advertisements. Gori Depo, 122:13–15. The lack of J Dog Media invoices showing a specific charge for social media advertising, at most, creates an issue of fact as to who created the advertisements. Second, Mr. Franclemont stated he procured the images "on other Facebook sites and pages, none of which were Facebook pages associated with, or describing by name, any Plaintiff, and all of which invited 'sharing' on the internet." Franclemont Decl., ¶ 8. Taken in the light most favorable to Defendants, a reasonable finder of fact could determine that neither Defendants nor Mr. Franclemont intended to deprive Plaintiffs of their images or any rights to them. As such, Plaintiffs are not entitled to summary judgment on their conversion claim. Because their conversion claim fails for purposes of summary judgment, their civil theft claim fails, as well. *Heldenmuth*, 128 So. 3d at 896; *see also Prou v. Giarla*, 62 F. Supp. 3d 1365, 1381 (S.D. Fla. 2014).

### D. Unjust Enrichment

Unjust enrichment is "an equitable claim based on a legal fiction which implies a contract as a matter of law even though the parties to such an implied contract never indicated by deed or word that an agreement existed between them." *14th & Heinberg, LLC v. Terhaar & Cronley Gen. Contractors, Inc.*, 43 So. 3d 877, 880 (Fla. Dist. Ct. App. 2010). "A claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (citing *Fla. Power Corp. v. City of Winter Park,* 887 So.2d 1237, 1241 n. 4 (Fla.2004) (citations omitted)).

Plaintiffs claim Defendants received the benefit of using their images without paying for them. Motion, ¶ 36. Plaintiffs cite to *Keller v. Electronics Art, Inc.*, to show that an unjust

enrichment action can stand where defendants reap a benefit from the unauthorized use of another's likeness. *Keller v. Elecs. Arts, Inc.*, 2010 WL 530108, at *10 (N.D. Cal. Feb. 8, 2010), *aff'd sub nom. In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268 (9th Cir. 2013). In *Keller*, the court discussed whether California law provided a cause of action for unjust enrichment and interpreted the law to provide relief on a restitutionary basis. *Keller*, 2010 WL 530108, at *10 ("Plaintiff sufficiently pleads claims for restitution against EA and CLC on the theory that they obtained a benefit from him through their alleged wrongful conduct."). However, in *Keller*, the plaintiff's theory of unjust enrichment was that the defendants were unjustly enriched from the sale of video games that used his likeness. *Id.* at *9. The benefit they received was not the cost of using the plaintiff's image without paying for it; it was making money from the sale of their game, presumably attributed to the use of the plaintiff's image. *Id.* Plaintiffs have not argued that Defendants unjustly profited from the use of their images by an increase in customers or other similar gain; they simply maintain that Defendants' use of their images constitutes a voluntary acceptance and retention of the benefit of using their photos without paying any fee. I am not convinced that the circumstances are such in this case that it would be inequitable for Defendants to retain this alleged received benefit, especially where Plaintiffs will receive compensation through at least two other claims—misappropriation of likeness—for the exact same harm. Plaintiffs are not entitled to judgment as a matter of law on their unjust enrichment claim.

### E. Damages

At this stage of the case, Plaintiffs have only prevailed on their misappropriation of likeness claims, Counts III and IV. Damages are therefore not available at this time on any other Counts. As for Counts III and IV, Plaintiffs claim they are entitled to the fair market value for the use of their images and reasonable royalties under Florida Statute § 540.08. As evidence of damages, Plaintiffs have submitted the Expert Report of Stephen Chamberlin (ECF No. 38-15). Defendants have not challenged the report through a *Daubert* motion, but have disputed the report because it is merely "opinion and speculation." While speculation is not permitted, Mr. Chamberlin is an expert witness and is entitled to give his expert opinion. *See* Federal Rule of Evidence 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion . . .

17

."). Defendants do not challenge Mr. Chamberlin's qualifications, simply his conclusions. However, Defendants have not submitted any evidence to the contrary. Mr. Franclemont's declaration opining that Plaintiffs' images are worth closer to $500 each is inadmissible because Mr. Franclemont has not been designated as an expert.

After reviewing Mr. Chamberlin's report, I do find his calculations of the total actual damages per Plaintiff to be problematic. For example, Mr. Chamberlin valued Plaintiff Alicia Whitten's "working day rate" at $5,000. Chamberlin Rep., 16. Mr. Chamberlin does not explain what "working day rate" means, but presumably it represents the fair market value for the use of each image. Defendants used one image of Plaintiff Whitten three times. *Id.* Mr. Chamberlin then calculated Plaintiff Whitten's actual damages as $30,000 rather than the expected $15,000. *Id.* Mr. Chamberlin provides no explanation as to where the $30,000 came from. Another example is Plaintiff Ashley Vickers. Mr. Chamberlin valued her "working day rate" at $100,000. *Id.* at 19. Defendants used three different images of Plaintiff Vickers; two images were used three times and one image was used twice. ECF No. 1-5. Mr. Chamberlin noted that Defendant BTS South Miami "used three images (One shoot day)," Defendant Booby Trap Doral "used three images (One shoot day)," and Defendant Booby Trap Pompano used one image. *Id.* at 19. Mr. Chamberlin then calculated Plaintiff Vickers' actual damages at $900,000. *Id.* It is unclear whether a "shoot day" equals a "working day" and it is again unclear how Mr. Chamberlin calculated the total actual damages. If the $100,000 "working day rate" was per use, the total would presumably be $800,000. If "one shoot day" equaled a "working day," then Plaintiff Vickers would presumably be entitled to slightly over $200,000. There is no explanation as to how the $900,000 was calculated. Similar confusion exists as to the calculation of the remaining Plaintiffs' actual damages. *Id.* at 20–46.

Even if I could rely on Mr. Chamberlin's report for the fair market valuation of the use of each Plaintiff's image, assuming that is what "working day rate" even means, Mr. Chamberlin has not sufficiently explained how he came up with his calculations for the total actual damages in his report. I therefore have to agree with Defendants that his calculations are speculative. While Mr. Chamberlin could further flesh out these inconsistencies at trial, at the summary judgment stage his expert report is insufficient to show the damages sustained by Plaintiffs as to Counts III and IV.

## IV. CONCLUSION

For the above stated reasons, Plaintiff's Motion for Summary Judgment is **GRANTED** as to Counts III and IV and **DENIED** as to the remaining Counts. I will issue a separate judgment pursuant to Federal Rule of Civil Procedure 58.

**DONE and ORDERED** in Chambers, Miami, Florida, this 14th day of February 2018.

_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of record*